# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 11 CR 580 |
| | ) | |
| STEVEN PAUL, | ) | Judge Ronald A. Guzmán |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

For the following reasons, Defendant's Motion pursuant to, inter alia, the Fifth Amendment along with Fed. R. Crim. P. 11(d)(2)(B), and for a *Kastigar-Palumbo* Evidentiary Hearing [210] is denied in part and entered and continued in part. To the extent that Defendant contends that he had a grant of immunity or deferred prosecution from the government and should not have been indicted, or at least should have had a pre-indictment *Kastigar* hearing, the motion is denied. To the extent Defendant contends he received ineffective assistance of counsel with respect to the deferred prosecution agreement, the motion is entered and continued pending a hearing on that issue only. Status is set for October 21, 2015 at 9:30 a.m. to set a hearing date.

## STATEMENT

Defendant has filed a motion for an evidentiary hearing to withdraw his guilty plea and dismiss the indictment against him. (Dkt. # 210.) Defendant maintains that he agreed to act as a confidential informant in the government's health care fraud investigation in reliance upon the government's assurance that he would have the benefit of transactional immunity. According to Defendant, he had a fully enforceable grant of immunity and could not have been prosecuted for

any of the crimes relating to his disclosures to the federal prosecutors and/or testimony before the grand jury.

## I. Background

A defendant challenging the government's use of immunized information "need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources." *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972). A defendant is entitled to a hearing under *Kastigar* if he can establish that he gave compelled testimony in a court proceeding: 1) based upon a promise of immunity; or 2) under a threat of contempt after invoking the privilege against self-incrimination. *United States v. Eliason*, 3 F.3d 1149, 1152 (7th Cir. 1993). "Informal grants of use and derivative use immunity are fully enforceable and implicate the provisions of *Kastigar*." *United States v. Quintanilla*, 2 F.3d 1469, 1483 (7th Cir. 1993); *United States v. Palumbo*, 897 F.2d 245, 248 (7th Cir. 1990) ("The parties do not dispute that Palumbo received informal use and derivative use immunity for his . . . proffer. Such grants of immunity are fully enforceable.").

In the case at bar, if Defendant voluntarily provided information pursuant to an agreement with the government, then he was not compelled to give testimony against himself and, therefore, *Kastigar* is inapplicable. However, if Defendant establishes the existence of an informal immunity agreement which the government supposedly breached, then the Court must determine whether the government has met its burden under *Kastigar*.

The primary hurdle Defendant faces in attempting to demonstrate that he had been promised immunity is that, prior to testifying before the grand jury, he expressly acknowledged his participation in the health care fraud at issue and *that he would be charged with four counts*

*of such fraud*. Specifically, on August 31, 2011, Defendant signed a plea letter with the government, which was addressed to Defendant's lawyer, stating in part:

> The purpose of this letter is to set forth the agreement between you, your client, Steven Paul, and the United States Attorney's Office for the Northern District of Illinois. Mr. Paul has admitted his participation in health care fraud activities in the Northern District of Illinois area and elsewhere. Mr. Paul will be charged with four counts of health care fraud, in violation of 18 U.S.C. § 1347.
>
> Mr. Paul will plead guilty to one count of health care fraud because he is, in fact, guilty of this charge.

(Gov't's Resp., Ex. B, Dkt. # 216-1.) The letter further provides that Defendant agreed to cooperate "in any matter in which he is called upon" by the government and, at the time of sentencing, if the government believed Defendant had provided the agreed-upon cooperation, it would recommend a downward departure of 50% of the low end of the Sentencing Guidelines range. (*Id*.) The letter concludes by stating that Defendant "acknowledges that he had read this agreement and carefully reviewed every provision with his attorney." (*Id*.) It is signed by Defendant, his attorney, Michael Dockterman, and a designate for the United States Attorney for the Northern District of Illinois. The indictment charging Defendant was filed on the same day as the date of the plea letter, August 31, 2011.

Slightly more than one year later, on September 24, 2012, Defendant pled guilty to one count of health care fraud pursuant to a written plea agreement, which included many of the same provisions of the plea letter he signed on August 31, 2011. (Plea Agreement, Dkt. # 70.) In the plea agreement, Defendant acknowledged that the plea was "entirely voluntary and represent[ed] the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 11 CR 580." (*Id*. ¶ 20.) Moreover, during the change of plea hearing, Defendant indicated to the Court that: (1) he had an opportunity to and actually did review the indictment and discussed the charges with his attorney; (2) he understood the charges

against him; (3) he was satisfied with his representation and advice provided by his attorney in the case; (4) he understood all of the terms of the plea agreement; (5) he signed the plea agreement; (6) he had no questions regarding the terms and conditions of the plea agreement; (7) the plea agreement represented the entire understanding that he had with the government; and (8) no one had made any other or different promise or assurance of any kind to induce him to plead guilty, that no one forced him to plead guilty and that he was pleading guilty of his own free will. (Gov't's Resp., Ex. C, Change of Plea Hr'g Tr., Dkt. # 216-1, at 5-8.)

Despite these agreements and acknowledgements, Defendant now seeks to dismiss the indictment and vacate the guilty plea on the ground that he had been promised immunity by the government.

## II. The Alleged Immunity and Deferred Prosecution Agreements

A defendant is entitled to an evidentiary hearing when he raises a significant disputed factual issue. *Matta-Ballesteros v. Henman*, 896 F.2d 255, 258 (7th Cir. 1990).[1] The allegations in the motion for an evidentiary hearing, however, cannot be vague or conclusory, but must describe the alleged promise with specific allegations as to its terms, when, where and by whom it was made. *Blackledge v. Allison*, 431 U.S. 63, 76 (1977). Here, Defendant filed an original affidavit in support of his motion with several exhibits attached. (*See* Def.'s Mot., Dkt. # 210, Grp. Ex. 1.) In his initial affidavit, Defendant makes many conclusory allegations, *e.g.*:

> During 2009 and particularly from May-August 2009, I was told I was acting on the government's behalf based on an immunity agreement that Mr. Cook [William J. Cook] and the government agreed upon.
> . . . .
> After all was said and done, the government breached its 'immunity' representation

---

[1] Although *Matta-Ballesteros* addresses a post-conviction § 2255 motion, the Court adopts the same standard as to whether a hearing is required on the instant motion to vacate Defendant's guilty plea prior to judgment being entered.

> . . . .
> I do not believe the government should have the power to represent to me that . . . I would receive immunity and not be charged, and then be indicted and told that if I dare challenge the government's conduct in my case, it [the government] would vindictively refuse to urge any court to lower my sentence.

(*Id.*, Ex. F at 1-2.) These are the types of conclusory allegations cautioned against in *Blackledge*. Alone, they are insufficient to justify the withdrawal of a well-documented guilty plea in which Defendant was given an opportunity to voice his objections but failed to do so. A defendant is ordinarily bound by his or her representations in court disclaiming the existence of additional promises. *See Carnine,* 974 F.2d at 928; *United States v. Ingram*, 979 F.2d 1179, 1184 (7th Cir. 1992). S*ee also Bemis v. United States*, 30 F.3d 220, 222 (1st Cir. 1994). Because the Court found the allegations in Defendant's initial motion vague and conclusory, it invited a supplemental submission requesting explicit declarations by persons with personal knowledge.

In his supplemental filing, Defendant does no better. He describes being present on October 16, 2009 at the United States Attorney's Office ("USAO") during a conversation between Assistant United States Attorney ("AUSA") Renai Rodney and his attorney Mr. Cook. (Def.'s Supp. Aff., Dkt. # 222, Ex. A.) But Defendant does not provide any details of the conversation and fails to indicate who said what. Instead, he alleges in conclusory fashion that, contrary to his sworn statements during his guilty plea, the government offered him a deferred prosecution agreement, which his lawyer rejected without ever explaining to him what such an agreement was or how it could be beneficial. What Defendant recalls is a meeting in which his attorney, Mr. Cook, after being handed a piece of paper by the AUSA, responded by saying, "This is not what we agreed to." He recalls Mr. Cook raising his voice for a few minutes, but does not recall or did not hear any of what Mr. Cook said.

A week or two later, Defendant avers, Mr. Cook told him that his immunity was "back on track.… [and] [a]round that same time he showed me what he described as the immunity letter." (*Id*. ¶ 5.) The Court has no idea what Defendant is referring to in this portion of his supplemental affidavit. Does "[a]round that same time" mean the same day, the same week, the same month? Moreover, Defendant gives no explanation of what Mr. Cook meant when he said "back on track," or even what Defendant took it to mean. He fails to describe the contents of the "immunity letter" he was shown or even describe with any degree of precision what Mr. Cook said to him when he showed him the letter. Defendant's supplemental filing is again a series of conclusory allegations in carefully phrased language sprinkled with a few meaningless facts. Further, his attorney's representations cannot bind the government. A vague and imprecise representation by Defendant's attorney cannot establish an offer or promise of immunity by the government. Defendant's failure to state in plain language where, when, and by whom the government made its promise of immunity dooms his claim.

Defendant also makes much of the claim that "[he] later learned that the document Ms. Rodney gave to Bill Cook was something called a deferred prosecution agreement." (*Id*. ¶ 6.) From this statement, the Court has no idea when, in the chronology of events, Defendant "learned" this fact. Was it before his guilty plea or after? The Court also has no way of knowing what Defendant means by "I later learned." How did he learn this? Did Mr. Cook tell him? Did his subsequent counsel tell him? He further fails to specify what document he is referring to. If he is describing the "10-16-2009 draft grand jury statements of Steven Paul," then he was misinformed. This document, attached as Exhibit A to Defendant's opening motion (Dkt. # 210-1, at PageID 1263-64), is a single page which merely states in relevant part "that the defendant is agreeing to cooperate with the government's investigation in exchange for ~~deferred~~

~~prosecution~~/transactional immunity [which is written in long hand] for my role in the billing scheme. Per the terms of my agreement, (to be detailed once finalized)." This document is not an offer of deferred prosecution and is clearly not intended to be a finished document, but appears to be a preamble to a draft of proposed grand jury testimony. Defendant also attaches, as Exhibit D to his motion, a document entitled "Government's draft Defer[red] Prosecution Agreement." (Dkt. # 210-1, at PageID 1270-1274.) It has the word "DRAFT" stamped in large letters across the middle of every page and is unsigned. No other evidence in the record indicates that the government made a formal offer of deferred prosecution. Accordingly, to the extent that Defendant contends that he had a completed and agreed-upon deferred prosecution agreement with the government, the Court rejects this argument.

In further support of his motion to dismiss the indictment and vacate his guilty plea based on the purported grant of immunity, Defendant has also submitted a letter from Mr. Cook, Defendant's counsel at the time, to the government, dated June 24, 2011, hereinafter "Cook's Letter." (Def.'s Mot., Dkt # 220, Grp. Ex. 1E.)[2] In it, Mr. Cook presents a long narrative describing his interaction with the government during his representation of Defendant. Mr. Cook acknowledges that the government initially promised only that the information Defendant supplied during the proffer process would not be used against him. Later on, Mr. Cook claims, the government agreed that all of Defendant's subsequent investigative assistance and the leads developed from his information and assistance also could not be used against him. Mr. Cook states that:

> [F]rom the time I first wrote to you in April 2009 about a possible proffer and Dr. Paul's willingness to cooperate with the investigation, the government has consistently taken the position that the line prosecutors would recommend that Dr. Paul receive immunity from prosecution. This was in addition to the protection

---

[2] Although it is not sworn, the Court will consider the exhibit.

> afforded Dr. Paul by the proffer itself . . . . For two years Dr. Paul's de facto immunity has been assumed by both sides. In the numerous conversations I had with you over those two years, you repeatedly told me that the reason Dr. Paul had not received formal immunity was simply that his appearance before the grand jury had been delayed due to the ever expanding nature of the investigation . . . . It was not until we met with you this April, however, that we had any indication that your office was questioning whether Dr. Paul should be given immunity at all.

(*Id.*) Further on, Mr. Cook explains how he progressed from the statement that his client had been offered protection from direct use of his proffered information to the belief that both sides were proceeding under the assumption that Defendant had "de facto immunity." According to Mr. Cook, on April 9, 2009, following Defendant's initial proffer (made pursuant to the terms of the initial proffer letter (Dkt. # 216-1, Ex. A)), AUSA Carolyn McNiven stated "an immunity grant was on the table and she would pitch the grant of immunity to David Glockner." In a subsequent conversation, AUSA McNiven advised defense counsel that she could not guarantee immunity, but that she would recommend it and her recommendations had never been overturned. Before Defendant commenced undercover cooperation, Mr. Cook confirmed that any information that developed or was derived from such cooperation, including investigative leads, would be subject to the terms of the proffer and not be used against him. At this point in his letter, Mr. Cook concludes that Defendant undertook the subsequent extensive undercover operations because "he had been led to believe that his extensive cooperation would result in a grant of immunity."

Mr. Cook further describes that on May 28, 2009, AUSA Rodney advised him that it looked good for Defendant's immunity and that she had put a call into AUSA McNiven. According to Mr. Cook's letter, he had further discussions during that summer about the terms of Defendant's formal immunity grant, including conversations with AUSA McNiven about

whether the immunity grant would take the form of a letter or a proceeding before the Chief Judge. AUSA McNiven informed Mr. Cook that she had received positive feedback and was doing everything she could with the front office regarding the request for immunity. These events and communications establish that Mr. Cook had not at any point received an actual offer of or agreement for immunity. If he had, the government would not be telling him that "it looked good for immunity," or that the line AUSA had "received positive feedback" and was "doing everything she could" to get him immunity.

According to Mr. Cook's letter, the next significant event occurred on October 6, 2009, when AUSA Rodney informed Mr. Cook that she had submitted the immunity request papers and that Defendant should expect to appear before the grand jury in the following weeks. The key word here is "request." AUSA Rodney would not be submitting a request for immunity approval to her superiors if immunity had already been approved, granted, or promised.

Next, Mr. Cook claims, AUSA Rodney informed defense counsel on October 8, 2009 for the first time that Defendant's ability to repay money to Blue Cross/Blue Shield would need to be resolved over the next few weeks. On October 15, 2009, AUSA Rodney stated that Defendant would need to provide restitution in the millions of dollars, and Mr. Cook explained that such an amount would not be possible. Clearly, what the letter describes up to this point is an ongoing negotiation for some sort of plea agreement.

A week later, on October 16, 2009, Mr. Cook claims the government gave him a draft of Defendant's proposed grand jury statement as prepared by the government prosecutors. (Def.'s Mot., Ex. A, 210-1.) As noted earlier, the exhibit states, in pertinent part: "I agreed to cooperate with the government's investigation in exchange for ~~deferred prosecution~~ transactional immunity [which is written in long hand] for my role in the billing scheme. Per the terms of my agreement

with the government, (to be detailed once finalized)." Based on this text, it appears that the government contemplated a possible agreement for deferred prosecution, not an agreement for immunity. The fact that defense counsel crossed out the phrase "deferred prosecution" and replaced it with the phrase "transactional immunity" would appear to reflect Defendant's expectation or demand, at least, of full immunity. But this proposed draft grand jury testimony is neither an offer nor a promise of immunity or deferred prosecution. It is not signed and does not spell out specific terms. In fact, it indicates on its face that there was yet no finalized agreement.

When the proposed draft of Defendant's grand jury testimony was disclosed, Mr. Cook strongly objected to the reference to a deferred prosecution agreement and made it clear that the deal the parties had been discussing was one for transactional immunity. According to Mr. Cook, AUSA Rodney was apologetic in acknowledging that this is not what Defendant expected and also ended by saying, "We will get this squared away." These statements could not have been taken by Mr. Cook to be promises of immunity. He knew full well, as a former AUSA, that front line prosecutors do not have authority to grant immunity without approval from their superiors and that such authority had not yet been received for Defendant's case.

On October 22, 2009, AUSA Rodney informed Mr. Cook that immunity was very much back on track, the government wanted Defendant to negotiate in good faith to try to reach a settlement with Blue Cross/Blue Shield, and such a settlement would be in lieu of any other restitution. Then, on October 23, 2009, Mr. Cook received a draft immunity letter prepared by the USAO dated October 6, 2009, which provided only for use immunity. Mr. Cook objected, insisted on transactional immunity, and provided the government with revised language to that effect by letter of October 27, 2009.

According to Mr. Cook, the government then created a new draft for Defendant's grand jury testimony which stated that Paul agreed to cooperate with the government's investigation "in exchange for immunity." This language, Mr. Cook claims, was contained in not only the government's first revised draft grand jury statement for Defendant, but also in all subsequent versions of the grand jury statement, "including the final version we signed off on in December 2009."

To this extensive chronology of events, the government responds simply that it made no offer of transactional immunity, formal or informal. The government asserts that at the outset of Defendant's cooperation in April 2009, he was provided with a standard proffer letter, which made no promise of immunity and which Defendant nonetheless accepted and signed. (Gov't.'s Ex. A, Dkt. # 216-1.) In the proffer letter, dated April 9, 2009, from the USAO to Defendant's counsel, the government stated that it sought a proffer of the Defendant's testimony regarding his knowledge of the facts underlying the investigation — not that it was offering immunity. The letter also promises that, in exchange for a completely truthful statement by Defendant, anything he told the government during the proffer could not and would not be used against him in the government's case in chief or in aggravation of Defendant's sentence. However, the letter also explicitly explains that the government was completely free to pursue any and all investigative leads derived in any way from the Defendant's proffer, which could result in the acquisition of evidence against him. (*Id.*) It also states that it embodied the only agreement between the parties. (*Id.*) Nothing could be further from the offer of full transactional immunity that Defendant claims to have been made.

Nonetheless, Defendant continues in his affidavit with the assertion that within a week thereafter, Mr. Cook was given an immunity letter from the USAO dated "prior to August 16,

2009." In support of this contention, Defendant has submitted a letter from October 5, 2009, which contains partly legible handwritten annotations and includes the words "Draft--Original to Glockner," with a line drawn through the entire letter. (Def.'s Mot., Dkt. # 210-1, Ex. B.)  The first two paragraphs of the letter promise use and derivative use immunity in exchange for complete, truthful, and accurate information and testimony. While the letter contains a signature line for United States Attorney Patrick J. Fitzgerald, it is unsigned.  The letter also contains a blank signature line below the words "I have read the above letter and agree to its terms" for Steven Paul.  The significance of this letter is unclear.  If authentic, it appears to support the contention that the parties were at least negotiating for use and derivative use immunity for Defendant.  On the other hand, it does not mention full transactional immunity, nor was it executed by either party.  Thus, it reflects that the parties were engaged in an ongoing negotiation, and that the original letter was supposed to be sent to "Glockner" – likely for review and approval.  This is a far cry from the claim that Defendant had already been promised immunity.

Assuming that Mr. Cook's chronology is completely accurate, at most it would appear that Defendant had a representation that the line prosecutors would recommend immunity from prosecution and that they believed strongly that their recommendation would be approved. Assuming such a representation was made, it offers no basis for concluding that Defendant actually had immunity from prosecution.  Mr. Cook's letter is full of conclusory statements, such as his perception that the parties all acted under the assumption that full immunity would be offered.  But Mr. Cook's letter makes clear that he understood the difference between being granted immunity and being promised that it would be requested of those who actually had the

authority to grant it. Indeed, Mr. Cook consistently asked about the status of the request for immunity, which would have been unnecessary had such immunity already been granted.[3]

The impression left by Mr. Cook's chronology is not that full immunity would indeed be offered, but that Mr. Cook believed Defendant's cooperation was of such a nature that it would and should warrant full immunity. On this record, it appears that Mr. Cook's decision to proceed without an actual offer or promise of immunity was a tactical decision made without any improper inducements or unfulfilled promises from the government by an experienced attorney with full knowledge of the facts and circumstances facing his client. There is nothing in Defendant's motion or supporting documents to even suggest that the prosecutors did not make a bona fide request of their supervisors for immunity or that they did not believe their request would be granted.

Moreover, there is good reason on the submissions alone to question Defendant's presentation of the facts. What Defendant does not satisfactorily explain is why, if he actually believed he had a promise of immunity, he signed the August 30, 2011 plea letter prior to his grand jury testimony admitting that he had committed fraud, acknowledging that he was going to be charged with four counts of fraud, and would plead guilty to one count of fraud. In that letter, which is dated two months after Mr. Cook's letter providing a chronology of events in the case and two-and-a-half years after the original proffer letter, see Dkt. # 216-1, Ex. A, Defendant specifically admitted that it accurately reflected his agreement with the government. Further, in subsequently signing his plea agreement, Defendant admitted that no promises had been made to him other than those in the agreement. Finally, in his plea colloquy, he specifically told this

---

[3] That he was aware he had no actual promise of immunity is reflected throughout Mr. Cook's letter, *e.g.*, "<u>would result in</u> a grant of immunity, "regarding the <u>request for</u> immunity," "had submitted the <u>immunity request</u>," and "the deal the parties had been <u>discussing</u>." Nowhere does Mr. Cook say immunity was actually offered or even promised.

Court, under oath, that his signed plea agreement contained the entire understanding he had with the government concerning his guilty plea, he understood the terms and conditions of the plea agreement and had no questions about it, and no other promises of any kind had been made to him in an effort to induce him to plead guilty.

In order to find that the government promised immunity, or even that Defendant was not fairly apprised of his agreement, the Court would necessarily have to find that Defendant's very specific and unambiguous signed and sworn representations were false and of no probative value whatsoever. *See United States v. Smith*, No. 12 CR 246, 2013 WL 3801889, at *2 (N.D. Ill. July 22, 2013) ("A defendant who states at a plea colloquy that his plea was 'freely and knowingly given . . . faces an uphill battle' in convincing a judge that his reasons for withdrawal are 'fair and just' because representations made at a plea colloquy are under oath and are given a 'presumption of verity.'") (citation omitted). Nothing in Defendant's pleadings provides any basis for such a conclusion. Further, based on Defendant's representations in the August 30, 2011 plea letter, which he signed the same day he testified in front of the grand jury, any perception that he had immunity was not reasonable. *See United States v. Cahill*, 920 F.2d 421, 427 (7th Cir. 1990) ("A defendant's perception that he is providing testimony under a grant of immunity does not make his statement involuntary unless the perception is reasonable.").

Defendant also argues that the failure to challenge the indictment on the basis of immunity is actually the result of ineffective assistance of counsel and that his plea should be vacated for that reason as well. But, as noted, the argument in this respect is premised upon the assumption that Defendant actually had received a grant of immunity and therefore was entitled to a *Kastigar* hearing. For the reasons given above, the Court does not agree with this underlying premise.

**III.     Ineffective Assistance of Counsel Regarding Deferred Prosecution Agreement**

In the alternative, Defendant asserts that counsel was ineffective for having failed to properly advise him regarding the proposed deferred prosecution agreement.  Generally, as with a plea agreement, an assertion of ineffective assistance of counsel with respect to a deferred prosecution agreement "presupposes the existence of a[n] . . . agreement."  *Martin v. United States*, 789 F.3d 703, 707 (7th Cir. 2015) ("A claim of ineffective assistance of counsel with respect to the plea negotiation process presupposes the existence of a plea agreement.").  While the Court has already found that no final deferred prosecution agreement existed, it is not clear from the record what Defendant knew, if anything, about the possibility of entering into a deferred prosecution agreement.  The record seems to indicate that the government was open to at least discussing the possibility of deferred prosecution:  Not only does the draft grand jury statement prepared by the government contain a reference to a deferred prosecution agreement (which was apparently crossed out by Mr. Cook upon his review of the draft statement), but Defendant attached to his motion a draft agreement to defer prosecution, again, apparently prepared by the government.

Defendant contends in his supplemental affidavit that neither Mr. Cook nor any of his other lawyers at Wildman "explained that th[e] agreement, which I would have immediately accepted, meant that I would not have been indicted if I followed the terms of the indictment." (Paul Supp. Aff., Dkt. # 222, ¶ 8.)  Defendant further states that he "did not learn what the agreement meant until the late spring of 2015 when I spoke with a federal criminal lawyer who was not a member of the Wildman law firm."  (*Id*.)  These statements are supported in part by the supplemental affidavit of Adam Calisoff, an attorney formerly at Wildman who began

representing Defendant in 2007 in a negotiation to exchange his chiropractic clinics with another shareholder. (Calisoff Aff., Dkt. # 222, ¶¶ 4-5.) When Defendant was contacted by the government about its health care fraud investigation, Mr. Calisoff "assembled a team of professionals [from Wildman, including William Cook] to handle his defense." (*Id.* ¶ 7.) According to Mr. Calisoff, he attended "all of the substantive internal meetings with [Defendant] and the other lawyers at [Wildman]," and accompanied Mr. Cook and other lawyers to the October 16, 2009 meeting at the USAO in which AUSA Rodney purportedly raised the possibility of a deferred prosecution agreement. (*Id.* ¶¶ 9-10.) While Mr. Calisoff attests that Defendant told him after that meeting that the government had proposed a deferred prosecution agreement, not an immunity grant, he further states that, to the best of his recollection, "neither Bill Cook [n]or any other members of [Wildman] explained to [Defendant] the significance of the deferred prosecution agreement as it related to [Defendant's] criminal liability or that if the conditions set forth in the deferred prosecution agreement were fully satisfied[,] that it would have resulted in [Defendant] not being indicted." (*Id.* ¶ 13.)

The government contends that Defendant's plea colloquy extinguishes any claim for ineffective assistance of counsel based on counsel's failure to inform him of the implications of a deferred prosecution agreement. But, if, as Defendant argues, he was not properly informed of the meaning and effect of a deferred prosecution agreement until spring 2015, then his statements at his earlier change of plea hearing that he was satisfied with his attorney's representation and understood the terms of the plea agreement would not necessarily preempt his ineffective assistance of counsel claim in this regard. The government also asserts that in order to show ineffective assistance of counsel, Defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." (Gov't's Resp., Dkt. # 216, at 15 (quoting *Lafler v. Cooper*, 566 U.S. ___, 132 S. Ct. 1376, 1384 (2012).).  According to the government, Defendant fails to provide any support in the record for his argument of ineffective assistance of counsel and asserts that Defendant's affidavit contradicts his claim "by referring to his attorney's receipt of a draft deferred prosecution agreement in October 2009." (Gov't's Resp., Dkt. # 216, at 15.)  But, if Mr. Cook indeed received a draft deferred prosecution agreement from the government and neither he nor any of Defendant's then-lawyers discussed the meaning and implications of the deferred prosecution agreement with Defendant, particularly when a definitive offer of immunity was not forthcoming from the government, then the Court cannot conclude based on the current record that the result of the proceeding would not have been different.

Accordingly, to the extent that Defendant seeks to vacate his guilty plea based on ineffective assistance of counsel with respect to advice he received (or did not receive) regarding the deferred prosecution agreement, the Court finds that a hearing is necessary before it can rule on this claim.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion Pursuant to, inter alia, the Fifth Amendment along with Fed. R. Crim. P. 11(d)(2)(B), and for a *Kastigar-Palumbo* Evidentiary Hearing [210] is denied in part and entered and continued in part. To the extent that Defendant contends that he had a grant of immunity or deferred prosecution from the government and should not have been indicted, or at least should have had a pre-indictment *Kastigar* hearing, the motion is denied. To the extent Defendant contends he received ineffective assistance of counsel with respect to the deferred prosecution agreement, the motion is entered and continued pending a hearing on that issue only. Status is set for October 21, 2015 at 9:30 a.m. to set a hearing date.

**SO ORDERED.**                                              ENTERED:   October 13, 2015

*[signature: Ronald A. Guzmán]*
_____
**HON. RONALD A. GUZMÁN**
**United States District Judge**