**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 11-cr-580-2 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| STEVEN PAUL, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, the Court denies Defendant's motion to withdraw his guilty plea [210]. The parties are directed to appear for a status on December 14, 2016 at 9:30 a.m. in order to set a sentencing date.

**STATEMENT**

**I.     Background**

The indictment in this case stems from an investigation by the Federal Bureau of Investigation and the Office of Inspector General of the Department of Labor into the billing practices of several suburban Chicago chiropractic clinics owned by Defendant Steven Paul ("Paul" or "Defendant"), codefendant Bradley Mattson, and others. On April 23, 2009, Defendant signed a proffer letter and began cooperating with the government's investigation, providing information concerning both his and others' roles in fraudulent billing practices at his chiropractic clinics. Between April 2009 and August 2009, Defendant made several consensual recordings of his conversations and meetings with other subjects of the investigation. On August 31, 2011, a federal grand jury returned an indictment charging Defendant, Mattson, and Neelesh Patel with several counts of health care fraud. Approximately one year later, in accordance with his plea letter and pursuant to a written plea agreement, Defendant pleaded guilty to one count of health care fraud. Specifically, Defendant admitted that from 1999 through 2008, he caused fraudulent claims for chiropractic, medical, and physical therapy services to be submitted to Blue Cross that were medically unnecessary or not actually provided. Defendant also admitted that he owed restitution in the amount of $1,336,290.00 to Blue Cross.

Sentencing was postponed until the completion of Defendant's cooperation with the government. Prior to being sentenced, however, Defendant filed, on May 5, 2015, a motion to withdraw his guilty plea and dismiss the indictment against him. Insofar as the motion alleged that Defendant had a grant of immunity or deferred prosecution from the government and should not have been indicted, or at least should have had a pre-indictment *Kastigar* hearing, the motion was denied in a written memorandum opinion and order on October 31, 2015 (Dkt. # 227). The Court ordered an evidentiary hearing, however, on Defendant's claim of ineffective assistance of

counsel with respect to defense counsel's alleged failure to inform him of the government's offer of a deferred prosecution agreement ("DPA"). The evidentiary hearing regarding Defendant's ineffective assistance of counsel claim commenced on May 31, 2016 and was continued to August 29, 2016. Oral arguments were heard on September 1, 2016.

## II. Applicable Law

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong analysis to be used in determining ineffective assistance of counsel claims. A defendant must show that the attorney's performance was deficient and that the deficiency resulted in prejudice to the defendant. *Id*. at 688, 694. In *Missouri v. Frye*, 132 S. Ct. 1399 (2012), the Court applied the *Strickland* two-prong test in a plea negotiation context. As to the first prong, the Court held:

> [A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. Any exceptions to that rule need not be explored here, for the offer was a formal one with a fixed expiration date. . . . Though the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides.

*Id*. at 1408. With respect to the prejudice prong, the Court held:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Id*. at 1409.

District courts in this circuit differ on the duty to communicate *informal* plea offers. *Compare Hull v. United States*, 01-CR-69-BBC, 2015 WL 5009998, at *3 (W.D. Wis. Aug. 18, 2015) (concluding that "[t]he letter on which petitioner relies cannot be construed as a formal plea agreement from the government that counsel [wa]s constitutionally required to bring to the

2

attention of his client" and thus petitioner had not demonstrated that "his trial lawyer denied him constitutionally effective representation" because as "the [Supreme] Court made clear in *Frye,* that duty applies only when the plea offer is a 'formal one'"); *Meschino v. United States*, 12 C 8519, 2013 WL 1707959, at *2 (N.D. Ill. Apr. 19, 2013) ("When there is a 'formal offer [ ] from the prosecution to accept a plea on terms and conditions that may be favorable to the accused,' defense counsel has the duty to communicate that offer to the accused.") (citation omitted) *with Penaloza v. United States,* 12 C 8728, 2015 WL 230402, at *4 (N.D. Ill. Jan. 16, 2015) ("The fact that the cover letter was not a 'formal offer' is irrelevant. The suggestion 'that because defendants have no constitutional right to be offered a plea agreement, defense counsel only has the duty to communicate formal plea offers to the defendant . . . is a misreading of *Missouri v. Frye.*'") (citation omitted, alteration in *Penaloza*); *Lechuga v. United States*, 15 F. Supp. 3d 788, 793 (N.D. Ill. 2014) (rejecting government's position that "defense counsel only has the duty to communicate formal plea offers to the defendant" and therefore that petitioner's "failure to allege that the government extended a formal, approved plea offer . . . undermines his claim" as a "misreading" of *Frye* and stating that "[d]efendants are entitled to effective assistance at all stages of the plea negotiation, and ineffective assistance at an early stage could prevent a formal offer from being made").

## III.   Discussion

The Court assumes knowledge of the relevant background facts and testimony presented at the evidentiary hearing, and will therefore not provide a detailed recitation of either prior to addressing the issue at hand.  It is helpful to note that Defendant's attorneys at the time of the negotiations at issue (William Cook, Brian Lewis, Adam Calisoff, and John Roberts) were at the law firm of Wildman Harrold Allen Dixon, LLP.  Defendant is represented on the instant motion to vacate his guilty plea by Michael King and Allen Ackerman.

There can be no doubt that the DPA that was presented to defense counsel by the line Assistant United States Attorney ("AUSA") at the October 16, 2009 conference (Draft Agreement Defer Prosecution, Def.'s Hr'g Ex. 3) was not a formal offer to defer prosecution. Defense counsel Cook testified that based on his experience of many years as an AUSA in a supervisory capacity in the Northern District of Illinois, a line AUSA does not have the authority, on her own, to make formal offers to defer prosecution, and thus he did not consider the DPA to be a formal offer.  His co-counsel on the case, Lewis, an attorney specializing in white collar criminal defense investigations, grudgingly concurred that what was presented to Cook at the October 16, 2009 conference was not a formal offer.[1]  In addition, an inspection of the document itself leaves little doubt it was not intended to be a formal offer.  Not only does each page of the document bear a "DRAFT" watermark, but the document also is unsigned and

---

[1] Lewis went to some lengths to emphasize that he was not a white collar criminal defense attorney, insisting instead that he specialized only in white collar criminal investigations defense, but stating that he would never appear in a courtroom on his own.  The difference appears to be insignificant in this case as none of the preliminary negotiations at issue occurred in court. Lewis was involved in the pretrial negotiations and was clearly comfortable with the nuances of plea negotiations as he initially characterized the DPA in several different ways before admitting it was not a formal offer.

incomplete in that the restitution amount is left blank, and it references an attached factual basis that is not attached and at the time did not exist. Clearly this document was intended to constitute the initial basis for a negotiation, nothing more.

Even assuming that Defendant had established that the DPA was a formal offer to defer prosecution, or that the law requires informal offers to be disclosed to a defendant under some circumstances, the *Frye* opinion also requires a defendant to demonstrate prejudice. *Frye*, 132 S. Ct. at 1409. As noted above, this means that Defendant must point to evidence establishing a reasonable probability that a formal deferred prosecution agreement offer would have been accepted. *Id*. Cook and Lewis both testified they expected Defendant to be granted immunity in exchange for his extensive cooperation, and were surprised and angered by the suggestion instead of deferred prosecution at the October 16, 2009 meeting. Defendant claims he did not see the DPA given to Cook at the October 16, 2009 meeting, and never had a specific conversation with Cook or anyone else about deferred prosecution. In fact, Defendant contends, he was told nothing about the DPA by anyone, and the following week Cook told him that "immunity was back on track."

If the Court accepts Defendant's testimony in this regard as accurate, the one and only time the government mentioned deferred prosecution was at the October 16, 2009 meeting, which was on a Friday. The next week, his attorney and the government continued their negotiations for immunity in exchange for cooperation, and nothing more was said about deferred prosecution. Under these circumstances, how likely is it that Defendant would have actually accepted deferred prosecution had it been communicated to him by his attorney? According to Defendant, he would have accepted such an offer immediately because it was exactly what he had hoped to receive in that he wished to avoid prosecution.

But it is difficult to credit this statement for several reasons. First, we have no knowledge of what a finalized deferred prosecution agreement would have included. A significant term of any such agreement is the amount of restitution (in this case, possibly in the millions of dollars) which, if Defendant could not pay, would thwart any such agreement. Another major consideration in any such agreement is the degree of misconduct Defendant would be required to confess – the statement of facts. Further, would the deferred prosecution agreement contain any travel restrictions, reporting requirements, and/or community service? Without any of this important information, Defendant himself likely has no realistic idea if he would have accepted a formal offer of deferred prosecution. So, it is not likely that Defendant would have immediately accepted deferred prosecution as he testified.

Furthermore, the evidence casts doubt upon Defendant's credibility. In his supplemental affidavit in support of his motion to vacate his guilty plea and dismiss the indictment (Dkt. # 222, Ex. A), Defendant states that no one ever explained to him that deferred prosecution meant he would not have been charged with federal offenses if he agreed to enter into such an agreement and complied with its terms. Defendant further testified that he never saw the document the AUSA handed to Cook at the October 16, 2009 meeting, and that no one discussed anything about a deferred prosecution agreement at his lawyers' offices after the meeting. In fact, he states he was never told what a deferred prosecution agreement meant. As more fully explained below, however, the testimony and email correspondence between Defendant's

attorneys both prior to and subsequent to the meeting of October 16, 2009, make it quite clear that, notwithstanding his denial, Defendant's attorneys did discuss with him what a deferred prosecution agreement is.

Defendant also represented to the Court under oath at his change of plea hearing that no one had made any promises or assurances of any kind in an effort to induce him to plead guilty other than what was stated in the plea agreement. The Court relied upon this sworn affirmation in accepting his plea of guilty as a knowing and voluntary plea. Since that time, however, Defendant has filed two affidavits with the Court. In the first affidavit (Paul Aff., Dkt. # 210-1, Page 21 of 22) he states, again under oath, that "from May-August 2009, I was told I was acting on the government's behalf based on an immunity agreement that Mr. Cook and the government agreed upon[,] . . . within a week [after the October 16, 2009 meeting], I was given (or rather Mr. Cook was given), an immunity letter from the U.S. Attorney's office in Chicago .…", and during May 2010, "the government . . . demanded as a final condition of written immunity that I negotiate a settlement with Blue Cross Blue Shield which I completed on May 24, 2010." (*Id*., ¶¶ 3, 4.) In his supplemental affidavit (Paul Supp. Aff., Dkt. # 222), Defendant further asserts that "Cook told me that my immunity paperwork would be finalized as soon as I made a restitution agreement with Blue Cross." (*Id*., ¶ 7)

These statements are direct contradictions of his sworn testimony in open court that no promises or assurances had been made to him by anyone other than what was expressed in the written plea agreement. According to his affidavits, multiple promises and assurances were made to him by Cook and the government that he would be receiving immunity from prosecution long before he testified under oath in court denying any such assurances or promises.

There is more. Before accepting his guilty plea as knowing and voluntary, the Court asked the Defendant if anyone had attempted to force him to plead guilty. He responded with a simple "No, your Honor." (Plea Tr., Dkt. # 80, at 7.) The Court also asked if he was pleading guilty of his own free will. He responded in the affirmative. (*Id*., at 7-8.) Yet in his first post-plea affidavit, Defendant refutes these sworn representations by stating that the government breached its agreement for immunity and told him that if he dared challenge its conduct, the government would vindictively refuse to urge any court to lower his sentence. (Dkt. # 210-1, Page 22 of 22, ¶ 5.) If true, this is clearly a threat by the government to force Defendant to plead guilty on the government's terms.

Defendant's supplemental affidavit (Paul Supp. Aff., Dkt. # 222, Ex. A) also contains statements that conflict directly with other sworn testimony. For example, he states that he "later learned that the document [the AUSA] gave to Bill Cook [on October 16, 2009] was something called a deferred prosecution agreement," but that "no one explained what that agreement meant." (*Id*., ¶ 6.) As we know from the affidavit of Adam Calisoff (Calisoff Aff., Dkt. # 222, Ex. B), another attorney representing Defendant at the time, Defendant "advised [Calisoff after the meeting with the government] that a deferred prosecution agreement, not an immunity grant, had been proposed by the Government." (*Id*., ¶ 11.) So it was not months or years later that Defendant first learned that deferred prosecution had been raised by the government, but that same afternoon. Moreover, he was aware that it was something significantly different from the immunity deal he claims to have been assured of because Defendant attested that when handed

5

the document at the meeting, Cook "stated [to the AUSA] that this was not our agreement" and "raised his voice for a few moments" before Defendant was asked to leave the room. (Dkt. # 222, Ex. A, ¶ 3.)[2] Taken together with his conviction for conducting a complex massive fraudulent scheme, his contradictions under oath make it difficult to believe anything the Defendant says.

Defendant's current counsel, Michael King, vehemently argues that it is absurd that anyone would counsel a client not to accept deferred prosecution and hold out instead for immunity. King would have the Court assume that there is no question that such an offer would be accepted. But the actual evidence directly contradicts this argument. First, we know from the testimony of all concerned that that is exactly what Cook, an experienced criminal trial attorney, did at the meeting with the government -- he completely rejected any talk of a deferred prosecution agreement and insisted on immunity. Second, Cook was not alone in this judgment. Defendant's only other attorney with white collar criminal law experience, Lewis, reached the same conclusion. In his email of October 16, 2009 to Calisoff, Cook and Roberts, Lewis insisted that the government would have to "step up" from an offer of deferred prosecution to immunity because "they need [Defendant] too much." (Def.'s Hr'g Ex. 7.) Clearly, Lewis believed Defendant would ultimately get immunity because he was convinced that the government could not go forward with the prosecution of any of the other conspirators without Defendant's cooperation. Lewis confirmed this in his testimony. The record is clear, therefore, that Defendant would have been counseled by both of his criminal defense attorneys not to pursue deferred prosecution but instead insist on complete immunity. Finally, given that Defendant contends that he had been led to believe that he would receive immunity in exchange for his cooperation, it seems highly unlikely that he would have rejected his lawyers' advice and accepted a formal offer of deferred prosecution. Of course, what was being considered was not a formal offer at all, but essentially an invitation to begin discussions toward a deferred prosecution agreement. The Court finds that Defendant has failed to establish a reasonable probability that even a formally offered plea would have been accepted.

This case illustrates the difficulty in evaluating a claim of ineffective assistance of counsel in situations involving something less than a formal offer. The decision to immediately decline to discuss an informal suggestion of deferred prosecution without first consulting with Defendant was clearly a judgment call made during the fluid give and take of plea negotiations and would not, in the context in which it occurred, constitute ineffective assistance of counsel. Cook testified he was completely surprised by the government's change of strategy, which constituted a step back from the immunity deal he had been expecting for months. Although a deferred prosecution agreement might ordinarily seem like a deal one does not refuse, when viewed by someone who had been extensively and actively cooperating with the government – to the point of wearing a wire – and who believed he was likely to receive immunity in exchange for that cooperation, deferred prosecution might not seem like a favorable deal at all. Obviously, Cook felt it was in the best interests of his client to push back hard rather than allow the

---

[2] Indeed, while Cook did not recall whether Defendant was at the October 16, 2009 meeting with the government, he testified at the hearing that when he was presented with the proposed DPA by the AUSA, he became "very upset" and the meeting turned "contentious." (5/31/16 Hr'g Tr., Dkt. # 250, at 15.)

government to believe that he would accept something less than immunity.  He was supported in this conclusion by the assurance of the line AUSA at the end of the October 16, 2009 meeting that the government was still considering a grant of immunity notwithstanding the introduction of the draft deferred prosecution agreement as well as the AUSA's apparent attitude of embarrassment at having to present the DPA as an alternative to immunity.

Moreover, as pointed out above, Cook was further supported in his choice of tactics by his experienced co-counsel.  Lewis concluded that the deferred prosecution initiative was just a "dance" by the line AUSAs so that they could tell their front office that they had tried unsuccessfully to cut the lowest deal possible but the only way to move forward was by granting Defendant immunity.  (Def.'s Hr'g Ex. 9.)  Given Defendant's initial longtime expectation of immunity, it is doubtful that he would have chosen to negotiate for deferred prosecution had his attorneys counseled that he would be better off holding out for immunity – as they clearly would have.  While one could argue that defense counsel's strategy to urge immunity rather than deferred prosecution may have been ill-conceived in hindsight, it is not the Court's function to second guess defense counsel at every stage of lengthy, complex, and multifaceted plea negotiations.  *See United States v. Pergler*, 233 F.3d 1005, 1009 (7th Cir. 2000) ("When reviewing ineffective assistance of counsel claims, we presume that the attorneys made reasonable judgments and decline to second guess strategic choices.")  Such negotiations are fluid, and Cook's decision to immediately reject the government's trial balloon of deferred prosecution was a judgment call.  In fact, it appeared to all that his gambit had been successful as just a few days later he was again reassured by the line AUSA that immunity discussions were back on track.  That the offer to discuss a deferred prosecution agreement was on the table only for a few days also counsels against a determination that Cook's performance in this case was in any way defective.  If the government had continued to maintain that immunity was no longer an alternative, a failure to communicate or follow up on a deferred prosecution arrangement would have constituted deficient performance of an attorney's professional responsibility, but that is not what happened.

The holding in *Frye* also requires that Defendant demonstrate a reasonable probability that an agreement to defer prosecution would have been entered into without the government canceling it or the trial court refusing to accept it. Again, the record fails to establish the existence of any such reasonable probability.  First, as already noted, the invitation to consider deferred prosecution was apparently only on the table for a couple of days.  Having first been broached on Friday, October 16, 2009, immunity was "back on track" the very next week.  Also, as stipulated by the parties, Defendant's attorneys forcefully petitioned the government for a deferred prosecution agreement on several separate occasions, going all the way up the U.S. Attorney's Office chain of command to the U.S. Attorney himself.  (Stmt. Stipulated Facts, Dkt. # 253, ¶¶ 1, 4, 5.)  One such attempt occurred before Defendant entered into his final plea agreement while three other attempts were made after the guilty plea. The government rejected each of these attempts.  If the U.S. Attorney's Office had believed a deferred prosecution agreement was the proper resolution of the case, it would have availed itself of these opportunities and entered into such an agreement.  It did not. Thus, the likelihood that the government would ultimately have finalized a deferred prosecution agreement is slim.

7

Finally, the foregoing analysis has been based on the assumption that Defendant was not told about the offer to negotiate a deferred prosecution. But the evidence on this point is also in substantial conflict. In his closing argument, defense counsel King described the evidence in support of a finding that Defendant was never informed of the government's willingness to discuss a deferred prosecution agreement. He pointed to Defendant's own testimony as well as circumstantial evidence that Cook's recollection of what happened, including when he would have informed Defendant of the deferred prosecution agreement, was flawed. Yet there is contrary evidence as well. First, Cook testified under oath, after being confronted with the inconsistencies of his recollection as to when and where he informed Paul of the events of the October 16, 2009 meeting, that he did inform Defendant about deferred prosecution but counselled against it and articulated the reasons for that advice. For the reasons discussed in detail above, if forced to choose between the sworn word of Defendant, a convicted fraudster, and that of Cook, an experienced attorney, the Court finds Cook's testimony to be the more credible.

But the Court need not rely on Cook's testimony alone. Defendant's claim of ignorance is contradicted by evidence that the defense team had been considering pretrial diversion as a possibility immediately before the October 16, 2009 meeting. One of the government's hearing exhibits is a stream of emails between three of Defendant's attorneys: Brian Lewis, Adam Calisoff, and William Cook. (Gov't's Hr'g Ex. 1.) It begins with an email from Lewis at 12:28 p.m. on October 16, 2009, which would have been, crediting Defendant's version of the chronology of events of October 16, 2009, before the meeting with the government. Lewis discusses specific items in Section 712 of the United States Attorneys' Criminal Resource Manual ("CRM") which explain pretrial diversion,[3] and cites with approval the CRM's language that strongly encourages innovative approaches to community service in pretrial diversion agreements. (Gov't's Hr'g Ex. 2.) Lewis suggests that, since Defendant lacks money to pay much in restitution, community service could be substituted instead. Approximately thirty minutes later, still before the meeting with the government, Calisoff agrees and makes suggestions as to the types of community service that Defendant could perform in the context of a deferred prosecution agreement. Finally, at 1:04 p.m. in that same email chain, Lewis writes that Defendant is in the conference room with him and he (Lewis) is briefing him (Defendant) on the restitution and the community service issues.

This exchange of emails makes clear that the defense team was researching and considering deferred prosecution possibilities before the October 16, 2009 meeting with the government. Lewis testified that the deferred prosecution research was done so that they could be prepared and Defendant could be well informed. As would be expected, Lewis agreed that he communicated what he learned about the government's policies on deferred prosecution to

---

[3] Although Lewis testified that there was a difference between deferred prosecution and pretrial diversion, the first subsection of the government's proposed deferred prosecution agreement is entitled "Conditions of *Pretrial Diversion*." (Def.'s Hr'g Ex. 3, at 1) (emphasis added). Moreover, both Cook, Defendant's attorney during the time period at issue, and King, Defendant's current attorney, used the terms interchangeably during the hearing. (5/31/16 Hr'g Tr., Dkt. # 250, at 10-21.) Because any distinction is not material to resolution of this motion, the Court does not make one for purposes of this ruling.

Defendant at the October 16, 2009 meeting at Wildman offices *just prior to* the afternoon meeting with the government.  Defendant, therefore, was briefed on the possibility of deferred prosecution before the October 16, 2009 meeting with the government, and according to Lewis, Cook would have been present at this meeting.  When viewed in conjunction with Calisoff's testimony that Defendant informed him at Wildman's offices after the October 16, 2009 meeting with the government that it had proposed deferred prosecution instead of immunity, Defendant's general claim that he never understood what happened at that meeting with the government or what deferred prosecution meant until after it was no longer a possibility is not convincing.

Also contradicting Defendant's version of events is an email chain between Cook, Lewis, Roberts, and Calisoff, which begins with an email from Cook to the other three at 5:17 p.m. on October 16, 2009, after the meeting with the government.  (Def.'s Hr'g Ex. 7.)  In that email, Cook states that they had a "setback" regarding immunity and that the review of the proposed grand jury statement was underway but would take some time.  To this, Calisoff responds at 6:35 p.m. with the statement, "I met with John [Roberts] and [Defendant] and discussed."  Given that Calisoff was responding to Cook's message regarding the "setback," *i.e.*, the deferred prosecution proposal, it is likely that Calisoff was referring to that when he wrote that he and Roberts had "discussed" something with Defendant.  This is especially true if one considers that the defense team had been researching and discussing such agreements with Defendant just prior to the meeting with the government.  Indeed, Roberts, the health law and regulatory specialist on Defendant's legal team, confirmed on cross examination that when he and Calisoff met with Defendant after the meeting with the government, they discussed what had happened at the U.S. Attorney's office, *i.e.*, the proposed deferred prosecution agreement.

Defendant, therefore, was aware that there was a difference between immunity and deferred prosecution.  Roberts specifically confirmed that Defendant knew about the offer of a deferred prosecution agreement, although he maintains they did not discuss any details about that proposed deferred prosecution agreement at that time.  But we know from the testimony of Lewis that Defendant had been briefed on what deferred prosecution was at the meeting at the offices of Wildman *before* they all proceeded to the meeting at the U.S. Attorney's Office.  Considering all of the statements both from the emails and the hearing testimony, it appears quite clear that Defendant was well aware of what deferred prosecution was, and that he was aware of what had happened at the meeting with the AUSA.

It is Defendant who bears the burden of showing ineffective assistance of counsel. To do so, he must overcome a highly deferential scrutiny of counsel's performance.  *Hill v. Lockhart,* 474 U.S. 52, 57-58 (1985); *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003).  Defendant has failed to do so in every respect.  He has failed to establish that he was not made aware of the government's preliminary offer of a deferred prosecution agreement or that he was unaware of the significance of an offer of deferred prosecution.  Even assuming he was not properly informed of the possibility of deferred prosecution, Defendant has failed to establish prejudice for it is not likely, given the particular circumstances of this complex and prolonged plea discussion, that he would have accepted such an offer when it was fronted, nor is it likely that the government's chain of command would ultimately have approved it.

## IV. Conclusion

For these reasons, Defendant's motion to withdraw his guilty plea is denied.

Date: December 6, 2016

**Ronald A Guzman**
**United States District Judge**